## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

In re VEECO INSTRUMENTS INC.     :     Case No.: 7:05-md-01695 (CM)(GAY)
SECURITIES LITIGATION          :

-------------------------------------------------- x

-------------------------------------------------- x

THIS DOCUMENT RELATES TO     :
ALL ACTIONS               :

-------------------------------------------------- x


## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
## FOR FINAL APPROVAL OF THE SETTLEMENT AND PLAN OF ALLOCATION


**BERGER & MONTAGUE, P.C**
Sherrie R. Savett
Carole A. Broderick
Arthur Stock
Phyllis M. Parker
Jeffrey L. Osterwise
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

*Lead Counsel for Lead Plaintiff Steelworkers Pension Trust and the Class*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    History Of The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.    Extensive Discovery Was Conducted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     C.    Extensive Motion Practice Was Conducted . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     D.    Class Certification Was Granted And A Notice of Pendency Of The Action
           Was Sent To The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     E.    Terms of the Proposed Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. THE PROPOSED SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS
     "FAIR, REASONABLE AND ADEQUATE" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           1.    The Complexity, Expense and Likely Duration of the Litigation . . . . . . 12

           2.    The Reaction of the Class to the Settlement . . . . . . . . . . . . . . . . . . . . . . . 13

           3.    The Stage of Proceedings and The Amount of Discovery Completed . . 14

           4.    The Risks of Establishing Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           5.    The Risks of Establishing Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           6.    The Risks of Maintaining the Class Action Through Trial . . . . . . . . . . . 19

           7.    Defendants' Ability to Withstand a Greater Judgment . . . . . . . . . . . . . . 20

           8.    The Range of Reasonableness of the Settlement Fund in Light of the
                 Best Possible Recovery, and in Light of Litigation Risks . . . . . . . . . . . 20

           9.    The Settlement Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.  THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED AS FAIR
     AND REASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Carson v. American Brands, Inc.*,
    450 U.S. 79 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 20, 22

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Goldsmith v. Technology Solutions Co.*,
    1995 U.S. Dist. LEXIS 15093 (N.D. Ill. Oct. 10, 1995) . . . . . . . . . . . . . . . . . . . . . . . 15

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re American Bank Note Holographics*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

In re *Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Blech Sec. Litig.*,
    2002 U.S. Dist. LEXIS 23170 (S.D.N.Y. Nov. 27, 2002) . . . . . . . . . . . . . . . . . . . . 17, 18

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007) . . . . . . . . . . . . . . . . . . . passim

*In re Global Crossing Sec. & Erisa Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
    142 F.R.D. 588 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Lloyd's Am. Trust Fund Litig.*
    2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) . . . . . . . . . . . . . . . . . . . . . 18

*In re Michael Milken & Associates Sec. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re PaineWebber Ltd. Pships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21, 22, 23

*In re PaineWebber Ltd. Pships Litig.,*
    147 F.3d 132 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Sumitomo Copper Litig.,*
    189 F.R.D. 274 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Maley v. Del Global Techs. Corp.,*
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Republic Nat'l Life Ins. Co. v. Beasley,*
    73 F.R.D. 658 (S.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Slomovics v. All for a Dollar, Inc.,*
    906 F. Supp. 146 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Strougo v. Bassini,*
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 20

*Warner Communications Sec. Litig,,*
    618 F. Supp. 735 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**FEDERAL RULE**

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## I.    PRELIMINARY STATEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Steelworkers

Pension Trust ("Steelworkers") submits this memorandum of law in support of its application for

final approval of the proposed Settlement of the above-captioned class action (the "Action") with

all Defendants, and the Plan of Allocation, and for entry of the accompanying Final Approval Order

and Judgment of Dismissal With Prejudice ("Final Judgment").[1] The proposed Settlement providing

a $5.5 million all-cash Settlement fund is an excellent resolution of an exceedingly complex case,

which has been hard fought on both sides. This Action, commenced on February 15, 2005, was

litigated on behalf of all persons who purchased Veeco securities during the period from April 26,

2004 and February 10, 2005 (the "Class"). The proposed Settlement represents an excellent recovery

for the Class and meets all applicable criteria for approval, and should therefore be approved.

This settlement resolves a securities fraud class action brought by the purchasers of Veeco

securities between April 26, 2004 and February 10, 2005, inclusive (the "Class Period"). The Action

was brought against Veeco Instruments Inc. ("Veeco"), and Individual Defendants Edward H. Braun,

John F. Rein, Jr., John P. Kiernan, and R. Michael Weiss (collectively, the "Defendants"). The

---

[1] Accompanying this memorandum (the "Settlement Memorandum") is the Declaration of Carole A. Broderick in Support of the Motion for Final Approval of the Settlement, Lead Counsel's Request for Attorneys' Fees and Reimbursement of Expenses and Award to Lead Plaintiff for Costs and Expenses (the "Declaration"). For a full description of the parties and claims brought in this Action, its procedural history and background, the mediation and settlement negotiations conducted, as well as the terms of the Settlement, the Court is respectfully referred to the Declaration. The Affidavit of Edward Sincavage, CPA, of Heffler, Radetich, & Saitta, LLP, the Claims Administrator in this Action (the "Sincavage Aff."), containing a certification regarding the mailing and publication of notice to the Class will also be filed with this memorandum. Also accompanying this filing is Lead Plaintiff's Memorandum of Law in Support of Its Motion For An Award of Attorneys' Fees and Expenses, and Reimbursement of Reasonable Costs and Expenses to Lead Plaintiff Steelworkers Pension Trust ("Steelworkers") for Representation of the Class (the "Fee Petition"), and supporting Affidavit of Lead Counsel and Declaration of Steelworkers, and Proposed Final Approval Order and Judgment of Dismissal with Prejudice.

complaint alleged that Defendants artificially inflated the market price of Veeco securities during the Class Period by issuing false and misleading financial statements in the first, second, and third quarters of 2004, which the Company was forced to restate shortly after the Class Period, which the Company attributed to accounting improprieties at its newly-acquired TurboDisc division, and which the Company admitted had concealed the unprofitability of TurboDisc from investors.  The Class was certified on March 21, 2006.  Pursuant to Fed. R. Civ. P. 23, class members were given notice of the pendency of the Action and trial date, and were given an opportunity to opt-out of the Action, only two shareholders opted out.

This Action has been actively litigated for almost two years, with extensive motion practice and discovery, and completed preparations for trial, including a full-day pre-trial hearing before this Court on June 28, 2007, with trial scheduled to begin on July 9, 2007.

On July 5, 2007, the parties entered into a Memorandum of Understanding ("MOU") agreeing in principle to settle the case for $5.5 million in cash.  The proposed settlement was achieved following negotiations between the parties, with the assistance of retired Judge the Honorable Nicholas H. Politan, who had served as a mediator throughout the litigation, including a two-day mediation in October 2006.  The Settlement, which was crafted at arm's length by very experienced counsel on both sides, provides guaranteed immediate relief for the Class, while eliminating all of the many risks and delays associated with the continued litigation of this Action, including the risk of no recovery at all.

Most importantly, the Settlement has been impliedly approved overwhelmingly by the Class. By Order dated August 23, 2007, the Court preliminarily approved the Settlement and directed that a hearing be held on November 2, 2007 to determine the fairness, reasonableness and adequacy of

the proposed Settlement. Pursuant to this Order, 15,528 copies of the Notice of the Proposed

Settlement, Motion for Attorneys' Fees and Settlement Fairness Hearing and Proof of Claim and

Release were mailed to potential Class members or their nominees beginning on September 12,

2007. *See* Sincavage Aff. at ¶10, filed concurrently herewith. A summary notice was also published

in *The Wall Street Journal* on September 19, 2007. *See* Sincavage Aff. at ¶11. The Notice and the

Proof of Claim and Release contained a detailed description of the history of the Action and the

terms of the proposed Settlement, a statement of the attorneys' fees and expenses sought, a

description of the claims to be released, the deadline for filing objections, proof of claim forms and

the time and place of the fairness hearing, and advised Class members of their right to object to the

Settlement or to request exclusion from the Class by October 19, 2007. As of October 24, 2007,

there were no objections to the settlement, and only one request for exclusion, from a shareholder,

Mr. Harold P. Houser, who was one of the two class members who had previously requested to be

excluded from the Class in response to the Notice of Pendency mailed to the Class in June 2007,

before the Settlement was reached. *See* Sincavage Aff. at ¶12.

## II.    STATEMENT OF FACTS

### A.    History Of The Litigation

The history and background of the Action are set forth in the Declaration and will be only

briefly summarized here. The Action was commenced on February 15, 2005 by the filing of a

complaint captioned L.I.S.T., Inc. v. Veeco Instruments Inc., Edward H. Braun, and John F. Rein,

Jr., C.A. No. 7:05-2189, and alleged claims under sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 and Rule 10b-5. Additional complaints were filed thereafter in both the

Eastern District of New York and the Southern District of New York. On May 15, 2005, all of the

3

cases then filed in the Eastern District of New York were transferred to the Southern District of New York and assigned to the Honorable Colleen McMahon for coordinated or consolidated pretrial proceedings with the cases then filed in the Southern District of New York. By Order dated October 12, 2005, the Court appointed Steelworkers Pension Trust ("Steelworkers") as Lead Plaintiff and Berger & Montague, P.C. as Lead Counsel for the Class and sole counsel.

On November 7, 2005, Steelworkers filed a Consolidated Amended Class Action Complaint (the "Complaint"), which superseded all prior complaints filed in the Action, and named additional Defendants John P. Kiernan and R. Michael Weiss.

The Complaint alleged, among other things, that the Defendants issued false and misleading statements in their financial statements, reports and related press releases and during analyst conference calls for the first, second and third quarters of 2004, which, as Defendants admitted after the Class Period, overstated Veeco's pre-tax earnings by $10.2 million, causing the Company to restate its financial statements for those quarters, and that certain of the Individual Defendants also issued false and misleading certificates of compliance with the Sarbanes-Oxley Act. The Complaint alleged that Veeco's financial statements during the Class Period concealed the unprofitability and true profit margins and accounting improprieties of Veeco's TurboDisc division, and the fact that TurboDisc had deficient or absent financial controls, and that Veeco's financial statements could not be relied on by the investing public. The Complaint alleged that these facts were concealed by Defendants during the Class Period, and that the problems were first disclosed to the public on the morning of February 11, 2005, before the market opened, when Veeco announced it would postpone the release of its audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of improper accounting transactions at TurboDisc. In the announcement,

4

Veeco explained that the investigation focused principally on the value of inventory, accounts payable, liabilities and revenue transactions, and that the investigation would likely lead to adjustments requiring the restatement of its financial statements for the first three quarters of 2004. The Complaint alleged that this announcement of the previously undisclosed material information resulted in more than a 10% drop in the price of Veeco stock, thereby causing damages to Lead Plaintiff and the other members of the Class.

By Order dated March 21, 2006, the Court denied Defendants' Motion to Dismiss the Complaint and, pursuant to F.R.D. Civ. P. 23, also certified a Class, consisting of all persons who purchased the securities of Veeco Instruments Inc. between April 26, 2004 and February 10, 2005 inclusive, and were damaged as a result thereof. The Court also certified Lead Plaintiff Steelworkers as class representative, and appointed Berger & Montague, P.C. as sole class counsel.

On April 10, 2006, Defendants answered the Consolidated Amended Class Action Complaint, denying all allegations of liability therein, and asserting affirmative defenses thereto. On October 11 and 12, 2006, the parties attempted to mediate the case under the supervision of Judge Nicholas H. Politan as mediator. However, the mediation was unsuccessful and the parties resumed document and deposition discovery, with a trial date set for July 9, 2007.

In preparation for trial, the parties prepared extensive pretrial submissions and filed numerous motions *in limine*. On June 28, 2007, the Court held a final pre-trial conference, during which the Court ruled, *inter alia*, on the admissibility of the parties' proposed evidence and on the motions *in limine*. Among the Court's rulings on the motions *in limine*, the Court ruled that members of the Class who purchased Veeco stock during the Class Period and who either sold those shares at a profit after the Class Period, or who retained those shares past the point when the price of Veeco stock first

5

recovered to the price at which those shares were purchased were not damaged by Defendants' alleged wrongful conduct.

Soon thereafter, the parties engaged in settlement discussions, with the assistance of mediator Politan. On July 5, 2007, the parties entered into a Memorandum of Understanding (the "MOU") to settle the Action for $5.5 million in cash. On August 16, 2007, the Parties signed a Stipulation and Agreement of Settlement (the "Stipulation"). The Court approved the Stipulation on August 23, 2007, preliminarily approving the proposed Settlement.

**B.    Extensive Discovery Was Conducted**

Following the denial of the motion to dismiss in March 2006, extensive fact and expert discovery began. Lead Plaintiff reviewed about 225,000 pages of documents produced by Defendants in response to Lead Plaintiff's document requests, including documents produced as a result of Lead Plaintiff's motion to compel Defendants' production of documents on backup tapes. Lead Plaintiff also subpoenaed documents from 26 third-parties - including Veeco's outside auditor Ernst & Young, Veeco customers and suppliers, and analysts who covered Veeco during the Class period - and received and reviewed approximately ten thousand pages of documents from Ernst & Young alone, and hundreds of pages more from the other third parties.

Lead Plaintiff took and defended many depositions in this case, beginning with Lead Plaintiff's defense of the depositions of Lead Plaintiff/class representative Steelworkers and its asset manager Fox Asset Management in connection with Lead Plaintiff's motion for class certification. During fact discovery, Lead Plaintiff conducted ten days of depositions, including the depositions of Individual Defendants Braun, Rein and Kiernan, three Ernst & Young partners involved in Veeco's audit before and during the Class Period, former TurboDisc controller Bruce Huff, to whom

6

the Company attributed the improprieties leading to the restatement, and Veeco's internal auditors during the Class Period, Gary Reifert and Herman Birnbaum. The parties also engaged in other fact discovery, including serving interrogatories and requests for admission upon Defendants. Following merits discovery, the parties conducted expert discovery, exchanging the reports of their respective accounting and damages experts, and took and defended expert depositions.

Finally, the parties completed substantial preparation for trial, including preparation of all the exhibits to the pre-trial order, which were submitted to the Court on June 6, 2007, and also filed and responded to numerous motions *in limine* and served trial witnesses subpoenas. The parties attended a pre-trial conference on June 28, 2007 and were prepared to begin jury selection on July 9, 2007.

In sum, the parties had conducted almost all of the fact and expert discovery necessary for trial. There is no question the parties were fully informed of the strengths and weaknesses of the parties' respective positions.

### C.    Extensive Motion Practice Was Conducted

In addition to the motion to dismiss and the motion for class certification, the parties engaged in extensive motion practice, including a number of hard-fought discovery motions in this case before Magistrate Judge George A. Yanthis. These motions included Plaintiff's motion to compel Defendants to produce documents concerning the internal investigation of TurboDisc by Veeco and Jefferson Wells, as well as oral argument on that motion, and a motion to obtain documents on backup tapes from Defendants. In addition, each party filed a number of motions *in limine* before this Court on June 6, 2007, and responses thereto.

7

**D.  Class Certification Was Granted And A Notice of Pendency Of The Action Was Sent To The Class**

On November 7, 2005, Lead Plaintiff moved for certification of the Class under Fed. R. Civ. P. 23. In connection with the motion, Lead Plaintiff produced documents in response to Defendants' requests, and defended the depositions of the proposed Class Representative, Lead Plaintiff Steelworkers, and its asset manager.  The Court certified the Class in its Order dated March 21, 2006, and appointed the Steelworkers as Class Representative, and Berger & Montague as Class Counsel.  However, the Court ruled that the Class Period would begin on April 26, 2004 (rather than November 3, 2003).

Pursuant to the Court's Order on May 15, 2007, Lead Plaintiff caused a Notice of Pendency of Class Action (the "Initial Notice") to be sent to putative class members, defining the Class as defined by the Court in its March 21, 2006 Order.  Beginning on June 1, 2007, Heffler, Radetich & Saitta LLP ("HRS"), the notice administrator retained by Plaintiffs, mailed out more than 11,390 notices of the action and caused the summary notice of the Action to be published in *The Wall Street Journal* on June 8, 2007.  The Initial Notice provided class members with an opportunity to opt-out by July 6, 2007.  As of that date, only two class members opted out.  Defendants and the Court were advised of the very small number of opt-outs.[2]  As discussed above, the Notice of Settlement was mailed to the Class on September 12, 2007, notifying the Class of the Settlement and providing a

---

[2] One of the opt-outs, Mr. Harold P. Houser asserted that he bought Veeco stock on June 7, 2004 at a cost of $2,603.00, and sold on April 27, 2006 for $2,230.73, for a loss of $372.27, without indicating the number of shares bought or sold on those dates. The other opt-out reported a purchase of 100 shares of Veeco on December 10, 2004, without providing any further information. On September 20, 2007, Mr. Houser again opted out following receipt of the Notice of Settlement, but still gave no further information.

second opportunity to opt-out, resulting in only one opt-out and no objections by the October 19, 2007 deadline.

### E.    Terms of the Proposed Settlement

As set forth in the Stipulation and Agreement of Settlement dated August 16, 2007 (the "Stipulation"), the central terms of the Settlement are as follows.  The Settlement provides for the creation of a fund in the amount of $5.5 million in cash, plus interest ("Gross Settlement Fund").  The Gross Settlement Fund, less all taxes, approved costs, fees and expenses is the "Net Settlement Fund."  The Net Settlement Fund is to be distributed to those Class Members who submit timely and valid Proofs of Claim to the Claims Administrator (the "Authorized Claimants").  Based on the Court's June 28, 2007 decision on the proper calculation of damages, Plaintiffs estimate that there were approximately 6.3 million damaged shares of Veeco common stock traded during the Class Period.  Plaintiffs estimate that the average recovery per damaged share of Veeco common stock under the settlement is $.87 per damaged share before deduction of Court-awarded attorneys' fees and expenses, and notice and claims administration costs.

The Plan of Allocation was prepared according to the analysis of Plaintiffs' damage expert, Steven P. Feinstein, Ph.D., CFA, with the assistance of Plaintiffs' Counsel, and in accordance with the Court's June 28, 2007 decision on Defendants' motion *in limine* regarding damages.   The Plan takes into account that (i) Class Members who purchased Veeco stock during the Class Period which they either sold at a profit or retained past the point after the Class Period when the price of Veeco stock recovered to the price paid by them were not damaged; (ii) the price varied at which Veeco stock declined following the Company's corrective disclosure on February 11, 2005; and (iii) any Class Member who sold before the corrective disclosure was not damaged.  Thus, an Authorized

9

Claimants' recognized loss ("Recognized Loss") is primarily determined by the date the Authorized

Claimant purchased or sold any of Veeco's securities, as set forth in detail in the Notice.

III.    **THE PROPOSED SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS "FAIR, REASONABLE AND ADEQUATE"**

There is a "strong judicial policy in favor of settlements, particularly in the class action

context." *In re PaineWebber Ltd. Pships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998). "Settlement

approval is within the Court's discretion, which 'should be exercised in light of the general judicial

policy favoring settlement.'" *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 U.S. Dist.

LEXIS 57918, at *10 (S.D.N.Y. July 27, 2007) (McMahon, J.) (citing *In re Sumitomo Copper Litig.*,

189 F.R.D. 274, 280 (S.D.N.Y. 1999); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d

358, 361 (S.D.N.Y. 2002)(McMahon, J.); *In re American Bank Note Holographics,* 127 F. Supp. 2d

418, 423 (S.D.N.Y. 2001)(McMahon, J.) As this Court has stated: "In its exercise of that discretion,

the Court must engage in a careful balancing act: 'The Court must eschew any rubber stamp approval

in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and

thorough investigation that it would undertake if it were actually trying the case.'" *American Bank

Note*, 127 F.Supp. 2d at 424 (citing *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)). "In

evaluating a proposed settlement under Rule 23(e) of the Federal Rules of Civil Procedure, the Court

must determine whether the settlement, taken as a whole, is fair, reasonable and adequate." *EVCI*,

2007 U.S. Dist. LEXIS 57918, at *10.

"A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and

adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable

counsel, well-experienced in class action litigation arising under the federal securities laws." *Id.* at

*11 (citation omitted).  Moreover, under the PSLRA, a settlement reached, as this one was, under

the supervision and with the endorsement of a sophisticated institutional investor, the Steelworkers

Pension Trust, "is entitled to an even greater presumption of reasonableness.. . . Absent fraud or

collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated

the settlement." *Id.* at *12.

The factors that the Court should consider in reviewing the settlement are well-established

in the Second Circuit.  *See Grinnell*, 495 F.2d at 463.   They are the following:

(1)     the complexity, expense and likely duration of the litigation;

(2)     the reaction of the class to the Settlement;

(3)     the stage of the proceeding and the amount of discovery completed;

(4)     the risks of establishing liability;

(5)     the risks of establishing damages;

(6)     the risks of maintaining the class action through trial;

(7)     the ability of Defendants to withstand a greater judgment;

(8)     the range of reasonableness of the settlement in view of the best possible recovery;
        and

(9)     the range of reasonableness of the settlement to a possible recovery in view of all the
        attendant risks of litigation.

*Grinnell*, 495 F.2d at 463; *Strougo v. Bassini,* 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003)(and cases

cited therein).  As set forth below, under these criteria, the proposed Settlement is fair, reasonable

and adequate.

### 1.    The Complexity, Expense and Likely Duration of the Litigation

This Action, like most securities fraud cases, presented complex factual and legal issues. Plaintiffs encountered (and would have certainly continued to encounter at trial, absent the Settlement) significant litigation risks, including proving all of the necessary elements to establish that Defendants' dissemination of materially false and misleading statements regarding Veeco violated Sections 10(b) and 20(a) of the Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

Plaintiffs were successful in simultaneously withstanding the motion to dismiss and obtaining certification of the Class. Subsequently, Plaintiffs obtained critical evidence to support their claims during merits and expert discovery. However, it was far from certain whether a jury would find that any or all of the Defendants were liable or that the jury would find that their level of culpability rose to the level of scienter, where there was no alleged insider trading by any Defendants, and no SEC or other governmental agency who had charged the Company with wrongdoing. Defendants were represented by highly experienced and tenacious counsel who presented Plaintiffs with a number of serious obstacles, including requiring Plaintiffs to file motions to obtain critical evidence. These included Plaintiffs' motion to compel Defendants production of documents relating to Veeco's internal investigation of the TurboDisc accounting issues that led to the Restatement and for production of documents on backup tapes. Defendants filed numerous substantial motions including the motion *in limine* to preclude Plaintiffs' damages expert from including certain damages in his calculations. Thus, Plaintiffs' Counsel recognized that continued litigation would be costly with no assurance of success, and, even if Plaintiffs won a judgment at trial, there was no assurance they would obtain damages beyond the amount of the Settlement.

In contrast, the proposed $5.5 million Settlement provides a substantial and tangible present recovery, without the attendant further expenses and the uncertainties and risk of *no* recovery that Plaintiff would encounter in a lengthy, complex trial and likely appeals. This case involved complex issues of accounting and internal financial controls which could be difficult to present and prove to a jury, and, even if Defendants' liability was proven, the Court had already reduced the number of Class members who could claim damages, thus reducing the total amount of damages that a jury could award. As this Court has repeatedly stated:

> Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement. As the court in *Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146, 149 (E.D.N.Y. 1995), concluded: "The potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class." *Id.* (citation omitted). The same reasoning applies here. Delay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value.

*EVCI*, 2007 U.S. Dist. LEXIS 57918, at *16-17 (citing *Maley*, 186 F. Supp. 2d at 361-362) (citation omitted).

### 2.    The Reaction of the Class to the Settlement

It is "well-settled" that the reaction of the class to a settlement is considered "the most significant factor to be weighed in considering its adequacy." *Maley*, 186 F. Supp. 2d at 362; *American Bank Note*, 127 F. Supp. 2d at 425; *EVIC*, 2007 U.S. Dist. LEXIS 57918 at *17. The lack of objections provides effective evidence of the fairness of the Settlement. *American Bank Note*, 127 F. Supp.2d at 425; *In re PaineWebber*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997).

Here, 15,528 copies of the Notice of the Settlement were sent to potential class members or their nominees. Sincavage Aff. at ¶10. Not a single objection has been received, and the deadline

for objections has passed. Moreover, there has been only one request for exclusion from Mr. Harold P. Houser. *Id.* at ¶12. Mr. Houser had previously opted-out from the Class in response to the Notice of Pendency of the action, before settlement was ever reached. *See* page 8, n.8 above.

Therefore, those affected by the Settlement have overwhelmingly endorsed it. *See Strougo*, 258 F. Supp. 2d at 259. The strong favorable reaction of the class is overwhelming evidence that the Settlement is fair, reasonable and adequate.

### 3.    The Stage of Proceedings and The Amount of Discovery Completed

The stage of the proceedings is another factor that should be considered in evaluating a proposed settlement, although the parties need not have engaged in full discovery for a settlement to be approved as fair. *See American Bank Note,* 127 F. Supp. 2d at 425-26. This case was litigated to the very eve of trial, after completion of merits and expert discovery during which Plaintiff received and analyzed the expert reports of Defendants' accounting and damages experts, deposed Defendants' damages expert, and proffered Plaintiffs' own accounting expert Robert W. Berliner, CPA, CFE, to opine on issues of liability, and damages expert Steven P. Feinstein, Ph.D. CFA, to opine on issues of loss causation, and damages. The parties had completed almost all pre-trial preparations, including attendance at the final pre-trial hearing at which the Court considered and ruled on the admissibility of key evidence. In addition to the completion of merits and expert discovery, the parties learned the strength and weaknesses of their respective case during a two-day mediation. In written submissions to the mediator and oral presentations during the mediation, both sides presented their best arguments in support of their respective positions.

Accordingly, the parties' knowledge of the strength and weakness of their claims was far more extensive than the norm in securities cases which are resolved at an earlier stage. In this case,

there is no question that Plaintiffs "have a clear view of the strengths and weaknesses of their case[]" and of the adequacy of the Settlement. *American Bank Note,* 127 F. Supp. 2d at 426 (citation omitted); *Maley,* 186 F. Supp. 2d at 363-64; *see also Meijer, Inc. v. 3M,* 2006 U.S. Dist. LEXIS 56744, at **46-47 (E.D. Pa. Aug. 14, 2006) (parties had "an adequate appreciation of the merits" of case at time settlement negotiated where: Class Counsel, *inter alia,* reviewed hundreds of thousands of pages of documents and depositions and consulted extensively with economic expert; and parties engaged in mediation, including exchange of mediation statements regarding merits of respective positions in order to inform and facilitate negotiations). *Goldsmith v. Tech. Solutions Co.,* 1995 U.S. Dist. LEXIS 15093, at *15 (N.D. Ill. Oct. 10, 1995) (plaintiffs' counsel's endorsement of the settlement "bears particularly significant weight" where counsel reviewed thousands of pages of documents, took several depositions, and worked closely with accounting and damages experts in evaluating the claims and estimating the potential recovery.)

### 4.    The Risks of Establishing Liability

In assessing this factor, the Court is not required to "decide the merits of the case or resolve unsettled legal questions," *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 (1981), or to "foresee with absolute certainty the outcome of the case." *In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000). "[R]ather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement*." In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

The claims in this case under section 10b-5 of the Exchange Act focus on whether Defendants issued false and misleading financial statements with scienter during the Class Period in Veeco's quarterly reports filed with the SEC for the first, second, and third quarters of 2004, and

15

in other statements concerning the Company's financial performance in press releases and analyst conference calls during the Class Period, whether certain of the Individual Defendants issued false and misleading certificates of compliance with the Sarbanes-Oxley Act in those Forms 10-Q, whether the price of Veeco securities was inflated during the Class Period, and whether Defendants' disclosure of the truth before the market opened on the morning of February 11, 2005 caused the price of Veeco stock to fall, thereby damaging Plaintiff and the other Class Members. Defendants have sharply contested the merits of their claims, with Defendants asserting that Plaintiffs could not prove that any Defendant is liable because the Company's restatement of the first three quarters of 2004 was caused solely by the accounting errors of the TurboDisc controller, and that the Company took corrective action as soon as the errors were discovered, including firing the controller and launching an independent investigation. Thus, Defendants would continue to assert, as they have, that even if Veeco's financial statements were restated for three quarters because of accounting errors at TurboDisc, Plaintiffs would be unable to prove that the statements were materially false and misleading and, even if they could prove the falsity of any statements, Plaintiffs would be unable to prove that any of the Defendants acted with scienter.

Plaintiffs recognize that scienter would be hard to prove since there were no allegations that any of the Individual Defendants had any financial motive to commit fraud, none of the Defendants engaged in insider trading during the Class Period, and neither the SEC nor any other governmental agency pursued a case against the company. Defendants would also claim that any flaws in their accounting were the result of reasonable reliance on their auditor, Ernst & Young LLP. Plaintiffs would have to prove scienter by circumstantial evidence of Defendants' conscious or reckless behavior, and it is impossible to predict whether a jury would find the circumstantial evidence

convincing to prove scienter. Indeed, at most, a jury might have concluded that Defendants were liable for simple mismanagement - by failing to fire an incompetent employee, and failing to adequately supervise its TurboDisc division - which is not actionable under the securities laws, thereby resulting in judgment for Defendants. *See In re Blech Sec. Litig.*, 2002 U.S. Dist. LEXIS 23170, at *4-5 (S.D.N.Y. Nov. 27, 2002) ("Plaintiffs recognize that establishing scienter, necessary for a showing of liability under Section 10(b), posed a substantial risk to their claims").

Plaintiff's Counsel believes that ample evidence exists to support their claims. Nevertheless, they recognize that ultimately a court or a jury may agree with Defendants' arguments and find that the Defendants did not violate the federal securities laws. Plaintiff's Counsel recognizes that shareholder class action litigation is notably unpredictable.

Moreover, in attempting to prove to a jury the elements of liability, materiality, causation, and scienter - - including the issues of the role of specific Individual Defendants in the alleged fraud, whether the actions violated GAAP and/or the Sarbanes Oxley Act, and whether the decline in Veeco's stock price at the end of the Class Period was caused by disclosure of the alleged fraud - - Plaintiffs likely would need to rely heavily on the testimony of its accounting and damages experts, who would be challenged by Defendants. Thus, a very lengthy and complex battle of the parties' experts likely would have ensued at trial, with highly unpredictable results. These risks as to liability strongly militate in favor of the Settlement. *Maley*, 186 F.Supp. 2d at 364 (noting the many obstacles to plaintiff's ability to prevail on the merits in a 10b-5 case).

### 5.    The Risks of Establishing Damages

Had this Action gone to trial, Defendants would not only have asserted strong defenses as to liability, but would also have raised strong defenses to Plaintiffs' claims of damages. First, the

17

Defendants would likely have asserted that little or no damages existed and that any decline in the price of Veeco securities was attributable to market or other non-fraud factors. Indeed, the damage assessments of experts retained by the parties vary substantially, and the assessment of this crucial element of Plaintiffs' case in particular would be reduced at trial to an argument between experts having conflicting analyses of highly complex economic data. *See, e.g., In re Lloyd's Am. Trust Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The reaction of a jury to such complex expert testimony is highly unpredictable"). A jury could be swayed by Defendants' expert seeking to establish that damages were caused by factors other than Defendants' wrongdoing, or, alternatively, trying to minimize the amount of losses suffered by the class. *American Bank Note*, 127 F. Supp. 2d at 427.

Even in a less challenging case, "[c]alculation of damages is a 'complicated and uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *Global Crossing,* 225 F.R.D. at 459 (citations and internal quotations omitted). The jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction which at best is uncertain.

> Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages . . . . In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad non-actionable factors such as general market conditions.

*American Bank Note,* (citing *Warner Communications Sec. Litig,,* 618 F. Supp. 735, 744-745 (S.D.N.Y. 1985). *See also Blech*, 2002 U.S. Dist. LEXIS 23170, at *5 ("Establishing damages from the drop in the relevant stock price, would, Plaintiffs claim, have degenerated into a 'battle of the experts' and thus posed a risk to Plaintiffs").

Most important, Plaintiffs' Counsel recognized that even if they could overcome all the obstacles and could prove that one or more of the Defendants was liable and had acted with scienter, Plaintiffs were constrained in their ability to prove that certain Class members had been damaged, following the Court's June 28, 2007 ruling on one of Defendants' motion *in limine* when the Court held that Plaintiffs' damages calculations could not include Class Members who purchased Veeco stock during the Class Period which they either sold at a profit or retained past the point after the Class Period when the stock price first recovered to the price at which the shares were purchased, since they can prove no economic loss that is attributable to any of the Defendants' alleged misrepresentations. This ruling substantially diminished the number of damaged class members and, thus, the amount of the calculated damages.

Consequently, while Plaintiffs believe that their claims were meritorious, and that the Class suffered real and substantial damages, there were no guarantees that Plaintiffs could recover their estimated damages, let alone recover any damages at all. Plaintiffs have avoided substantial risks in proving damages by virtue of the proposed $5.5 million Settlement. The fairness and reasonableness of the proposed Settlement, in light of the risks, are manifest.

### 6.    The Risks of Maintaining the Class Action Through Trial

There is no issue here. The Court certified a class early in this litigation, in March 2006. Only two Class Members opted out after the Initial Notice of pendency in June 2007. *See* page 8, n. 8 above. The Defendants did not seek decertification. This factor had no bearing on settlement negotiations.

19

### 7.    Defendants' Ability to Withstand a Greater Judgment

This factor had little bearing on settlement negotiations. Although the Individual Defendants had limited resources and limited insurance, Veeco does have substantial net worth. However, this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied.. *See Meijer,* 2006 U.S. Dist. LEXIS 56744, at *51 ("this determination in itself does not carry much weight in evaluating the fairness of the Settlement"); *D'Amato v. Deutsche Bank,* 236 F.3d 78, 86 (2d Cir. 2001) (upholding approval of settlement despite defendants' ability to withstand greater judgment, where other *Grinnell* factors were met).

### 8.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery, and in Light of Litigation Risks

In evaluating the proposed Settlement, the Court is not required to engage in a trial on the merits to determine the prospects of success. *Strougo,* 258 F. Supp. 2d at 260 (citing *In re Michael Milken & Assocs. Sec. Litig.,* 150 F.R.D. 46, 54 (S.D.N.Y. 1993)). Similarly, the Court is not to compare the terms of the Settlement with a hypothetical or speculative measure of a recovery that might be achieved by prosecution of the litigation to a successful conclusion. *Republic Nat'l Life Ins. Co. v. Beasley,* 73 F.R.D. 658, 668 (S.D.N.Y. 1977). In view of the risks of proving liability and of recovering damages, discussed above, this Settlement provides a substantial recovery.

In *Grinnell,* the Second Circuit noted that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell,* 495 F.2d at 455. The Court further noted, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2.

20

*Maley,* 186 F. Supp. 2d at 366 (same). *See also Weinberger v. Kendrick,* 698 F.2d 61, 65 (2d Cir.

1983) (settlement which amounted to only a negligible percentage of the losses suffered by the class

was affirmed); *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 596 (S.D.N.Y. 1992)

(court approved settlement after determining that the settlement would provide "slightly more than

48 cents [per share]" out of the potential recovery of approximately $30 per share).

The $5.5 million all-cash recovery in this Action is significant and, in light of the risks facing

Plaintiffs, the unpredictability of a lengthy and complex trial, the inevitable appellate process that

would follow with the risk of reversal, and the limits on damages posed by the Court's opinion, the

$5.5 million Settlement falls squarely within the "range of reasonableness." *In re Paine Webber,* 171

F.R.D. at 130-31 (citations and internal quotations omitted); *American Bank Note,* 127 F. Supp. 2d

at 428.

Moreover, published data on securities fraud settlement further confirms the quality of the

proposed Settlement. The $5.5 million settlement results in an estimated average recovery of $.87

per share for the approximately 6.3 million shares which suffered damages in accordance with the

Court's June 28, 2007 opinion, or 23.2% of the estimated maximum $3.75 per share suffered by any

Class Member. The 23.2% possible recovery of estimated damages exceeds the median percentage

reported by Cornerstone Research for settlements overall, which was 3.6% through year-end 2005

and 2.4% for 2006.[3]    For settlements where the estimated damages were less then $50 million

(similar to this case) the percentage was 10.5% through year-end 2005 and 8.8% in 2006. *See*

Cornerstone Report at p.6. In view of the risk that the jury could have found that Plaintiffs were

---

[3] *See* Laura E. Simmons & Ellen M. Ryan, *Cornerstone Research, Securities Class Action Settlements: 2006 Review and Analysis* (Cornerstone Research 2007) at p. 6, http://www.cornerstone.com (the "Cornerstone Report").

entitled to *no* recovery, the proposed settlement that represents a recovery of up to 23.2% of the possible damages supports approval of the settlement. Accordingly, these measures also weigh in favor of approval of the Settlement. *Maley,* 186 F. Supp. 2d at 366.

### 9.    The Settlement Negotiations

In assessing whether a settlement is fair, reasonable and adequate, courts often focus on the "negotiating process by which the settlement was reached." *American Bank Note,* 127 F.Supp. 2d at 428 (citation omitted). Courts look to this process in order to ensure that the settlement resulted from "arm's-length negotiations" between counsel with the "experience and ability necessary to effective representation of the class's interests." *Id.; Grinnell*, 495 F.2d at 463-66. In this context, courts consider the opinion of experienced counsel with respect to the value of the settlement. *PaineWebber*, 171 F.R.D. at 125 ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation") (citation omitted). In this case, qualified and experienced counsel for both sides who litigated the case vigorously for many months up to the very eve of trial, recommend final approval of the Settlement.

The negotiations for the Settlement, like every step of the litigation, were intense, hard-fought and conducted at arm's-length between experienced and skilled attorneys who knew the strengths and weaknesses of their respective cases and were ready for trial to begin on July 9, 2007, and an experienced mediator. Moreover, in the course of litigation, both sides had exchanged mediation statements which revealed the respective strengths and weaknesses of the claims and defenses. The mediation that finally resulted in this settlement followed the end of merits and expert discovery and preparation for trial. "So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement." *American Bank*

22

*Note,* 127 F. Supp. 2d at 428 (citing *PaineWebber,* 171 F.R.D. at 125). That presumption should apply here.

## IV.    THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED AS FAIR AND REASONABLE

A plan of allocation is fair, reasonable and adequate as long as it has a "reasonable, rational basis." *Maley,* 186 F. Supp. 2d at 367. Because it is impossible in a large class to calculate each member's claim with mathematical precision, courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re PaineWebber,* 171 F.R.D. at 133.

Lead Counsel, together with its damages expert Steven P. Feinstein, Ph.D., CFA, determined the appropriate allocation of damages. The Plan reflects an assessment an individual Class Member's damages based on when the Class Member bought or sold Veeco stock. The plan of allocation follows the Supreme Court's decision in *Dura Pharmaceuticals,* and requires that the claimant must have purchased the security during the Class Period and held it on the day of corrective disclosure, recognizing that only Class Members who bought during the Class Period and sold their shares after the Class Period ended on February 10, 2005, suffered an economic loss. *See, e.g., Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005). The plan of allocation also recognizes that, in accordance with this Court's June 28, 2007 decision, shares of class members sold after the corrective disclosure at a price higher than or equal to the initial purchase price, and any shares of class members who chose to retain their shares past the point when the stock price first recovered to the price at which the shares were purchased, can prove no economic loss. In practical terms, this

means that under the Plan, any shares held at the close of trading on May 8, 2006, have no recognized loss, because on May 9, 2006, Veeco's stock traded at a price equal or greater than any price at which Veeco traded during the Class Period. *See* Notice at p. 9.

Incorporating these principles, the Plan of Allocation provides for the distribution of the Net Settlement Fund on a proportionate basis, based on a formula based on the decline in the price of Veeco stock following the disclosure before the market opened on February 11, 2005, that the Company expected to restate its financials for the first three quarters of 2004. *See* Notice at p. 9. "Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim." *American Bank Note,* 127 F. Supp. 2d at 429. "[T]here is no rule that settlements benefit all class members equally. . . ." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir. 1983). Instead, the general rule is that an allocation formula need only have a reasonable and rational basis, particularly if recommended by experienced and competent class counsel. *American Bank Note,* 127 F. Supp. 2d at 429-30. Plaintiffs' Counsel's conclusion that the Plan of Allocation is fair and reasonable is therefore entitled to great weight. *Id.* at 430 (approving allocation plan and according counsel's opinion "considerable weight" because there were "detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

Under the Plan of Allocation, an independent claims administrator, Heffler, Radetich & Saitta LLP, will calculate each claimant's "recognized loss" based on the class member's proof of claim. Each valid claim will then be calculated so that each authorized claimant will receive, on a

proportionate basis, the share of the net settlement fund that the claimant's recognized loss bears to the total recognized loss of all authorized claimants.

The Plan of Allocation fairly, equitably, and adequately allocate the proceeds of the settlement among the class members who submit valid claims, with a minimum of complication, ensuring efficiency in claims administration. Finally, not one class member has objected to the Plan of Allocation which was fully explained in the Notice of Settlement sent to all Class Members. This favorable reaction of the Class supports approval of the Plan of Allocation. *Maley,* 186 F.Supp. 2d at 367.

Accordingly, Plaintiffs submit that the Plan of Allocation is fair, reasonable and adequate, and should be approved.

## V.    CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declaration, Lead Plaintiff respectfully requests that the Court approve the Settlement and Plan of Allocation as fair, adequate and reasonable.

Dated: October 26, 2007                Respectfully Submitted,

                                       **BERGER & MONTAGUE, P.C.**

                                       By: _____
                                           Sherrie R. Savett
                                           Carole A. Broderick
                                           Arthur Stock
                                           Phyllis M. Parker
                                           Jeffrey L. Osterwise
                                           1622 Locust Street
                                           Philadelphia, PA 19103
                                           (215) 875-3000

                                       *Lead Counsel for Lead Plaintiff*
                                       *Steelworkers Pension Trust and the Class*

malta431567-03a.wpd

25